Roussis v Staten Is. Univ. Hosp.-N. (2025 NY Slip Op 50782(U))

[*1]

Roussis v Staten Is. Univ. Hosp.-N.

2025 NY Slip Op 50782(U)

Decided on May 14, 2025

Supreme Court, Richmond County

Troia, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 14, 2025
Supreme Court, Richmond County

Christiana Roussis and EUGENIA ROUSSIS, as Executrixes 
 of the Estate of VASILIKI ROUSSIS, and CHRISTIANA ROUSSIS and EUGENIA ROUSSIS, Individually, Plaintiffs,

against
Staten Island University Hospital-North, Defendant.

Index No. 150229/2023

For the plaintiffs: Sinel & Olesen, PLLC, by Denise Dessel, Esq..
For the defendant, Staten Island University-North: Amabile & Erman, P.C., by Flutra Limani, Esq, and Mauro Lilling Naparty LLP, by Jennifer Adler, Esq.

Charles M. Troia, J.

The following e-filed documents, listed by NYSCEF document numbers (Motion 002) 21 through 67 and 69 through 72, were read on the defendant's motion for dismissal and summary judgment, submitted on February 26, 2025.
In this alleged medical malpractice action, the defendant, Staten Island University Hospital-North (hereinafter "SIUH"), moves for summary judgment and dismissal of the complaint pursuant to CPLR § 3211 and CPLR § 3212, and for such other and further relief as this court deems just and proper.
The defendant seeks summary judgment arguing that this case should be dismissed pursuant to New York's Emergency or Disaster Treatment Protection Act (Public Health Law former art 30-D, §§ 3080-3082, repealed by L 2021, ch 96, § 1; hereinafter "EDPTA"), pursuant to the federal Public Readiness and Emergency Preparedness Act (42 USC § 247-d-6d; hereinafter "PREP Act") and pursuant to ordinary medical malpractice principles.
The defendant supports its motion, inter alia, with the expert affirmations of Roy Goldberg, M.D., a physician duly licensed to practice medicine in New York who is board certified in internal medicine and certified with advanced qualifications in geriatric medicine; and Joy B. Alvarez, R.N., B.S.N., M.A., a registered nurse duly licensed to practice nursing medicine in New York and who is a certified nurse practitioner; and the affirmation Shari Torres, R.N., D.P.N., the current Senior Director of Critical Care at SIUH and who was [*2]employed as the Director of Nursing Education and Professional Development at SIUH in 2020.
The plaintiff opposes the defendant's motion and has submitted, inter alia, the expert affirmation of a physician (name redacted) duly licensed to practice medicine in New York and who is board certified in internal medicine and geriatric medicine.
The court notes that plaintiffs' claims regarding an alleged shoulder injury were withdrawn by stipulation (NYSCEF Doc. No. 32). Additionally, the plaintiffs withdrew claims related to negligent hiring, training, and supervision as to the defendant (NYSCEF Doc. No. 64, paragraph 40) and failed to oppose dismissal of the alleged wrongful death claim. Consequently, the preceding claims are dismissed.
Upon the foregoing papers, the defendant's motion is granted as the immunity afforded by the EDTPA is applicable to the health care services rendered to the decedent during the hospital admission. The court's decision is outlined below.
FACTS
This action arises from the alleged negligent treatment of the decedent, Vasiliki Roussis, (hereinafter "decedent") by the staff at SIUH during her admission to the hospital from December 25, 2020 to February 3, 2021. Claims include the improper prevention and treatment of skin ulcers and infections, causing pain, suffering and death.
Plaintiffs allege (NYSCEF Doc. Nos. 30-31) that the staff at SIUH were negligent and committed malpractice by: failing to adequately and properly examine decedent and perform a proper risk assessment of decedent for development of pressure ulcers, infections and falls; failing to prevent skin breakdown and infections in a patient whose age, mobility level and general state of health demanded higher scrutiny; failing to heed, detect and diagnose decedent's symptoms and complaints as they related to pain and development of pressure ulcers; failing to properly monitor and treat decedent's pressure ulcers; failing to turn and position the decedent every two hours and as needed; failing to provide proper nutrition and hydration to decedent; failing to provide proper hygiene; failing to timely order and implement the proper pressure-relieving devices and equipment; failing to timely order and follow up on consultations with surgeons and specialists to address decedent's pressure ulcers; failing to order appropriate and proper medications as they relate to the management and care of decedent's pain and pressure ulcers; failing to guard and monitor against the development of pressure ulcers, infections and prevent irreversible complications; failing to keep accurate records of the treatment rendered to decedent; failing to institute and adhere to an effective care plan and modify the care plan as the decedent's condition changed; failing to timely order and perform debridement procedures for pressure ulcers on decedent's body; and failing to institute and adhere to proper and adequate policies and procedures for the prevention and treatment of pressure ulcers. As a result of the alleged negligence, plaintiffs claim that decedent suffered: sacral pressure ulcers, debridements, deep tissue injury, infection, sepsis, dehydration, malnutrition, emotional trauma, pain and suffering, exacerbation of prior soft and deep tissue injuries and death.
In the days before she presented to SIUH, the 81-year-old decedent tested positive for COVID-19 at an urgent care facility. She had cold and flu symptoms, including a cough and difficulty breathing. Antibiotics and steroids were not effective for her COVID-19 pneumonia infection or her condition. On December 25, 2020, the decedent's sons called 911 and she was taken by ambulance to the SIUH Emergency Room in respiratory distress. In the ambulance, her oxygen saturation rate was 60% which is very low, and in the Emergency Room, decedent was [*3]emergently intubated due to her respiratory distress, and she was started on medication for low blood pressure and severe sepsis (NYSCEF Doc. No. 26.
From the ER, the decedent was admitted to the ICU where she remained during her entire admission to SIUH up to her death on February 3 , 2021. During this admission, which took place during the second wave of COVID-19 when cases began to rise again in New York State, the decedent was treated for COVID-19 and was followed by the ICU attending who managed her care including mechanical ventilator support, subsequent tracheostomy, pressors, sedation, paralytics and ICU life-saving support measures (NYSCEF Doc. No. 26).
On December 27, 2020, the consulting nephrologist recommended dialysis for chronic kidney disease leading to kidney failure. Although started initially because of elevated potassium levels, dialysis treatments were subsequently discontinued because the decedent could not tolerate them (NYSCEF Doc. No. 26).
The decedent was suffering from COVID-19 pneumonia and severe sepsis, and as such, she was also seen by an infectious disease (ID) consultant on December 28, 2020. She was given IV antibiotics and steroids, and prone positioning was recommended, if possible. ID followed the decedent throughout the admission (NYSCEF Doc. No. 26). 
The decedent did not have any skin breakdowns or pressure ulcers on admission to SIUH. According to the nursing flow sheets on December 25, 2020, a skin assessment was done which revealed blanchable redness, ecchymosis and intact skin. At that time, the decedent was assessed as at-risk for development of pressure ulcers (Braden score was 13) as she had multiple factors that increased her risk of skin breakdown including sepsis, mechanical ventilator support, sedation, immobility and several other medical conditions. (See, generally, SIUH records NYSCEF Doc. Nos. 48-63; NYSCEF Doc. No. 26 and NYSCEF Doc. No. 27).
Therefore, pursuant to the hospital's pressure ulcer prevention, management and treatment policy (NYSCEF Do. Nos. 34-36), a plan of care for prevention and treatment of pressure ulcers was implemented by SIUH and its staff including: serial Braden scale assessments, regular plans of care and skin assessments, staging, measuring and photographing of pressure ulcers, turning and repositioning every two hours, pressure re-distribution pressure-relief mattress, rotation therapy, local wound care, skin cleansing, drying and hygiene, linen changes, use of barrier creams, ointments, and medicated dressings, off-loading measures using cushions, wedges and pillows for pressure relief, heel pads/devices, padding skin to skin, padding tubing and devices, transparent dressing, limit use of adhesives and drying agents, positioned off wounds, pressure points protected, skin protection tubing/devices free from skin contact, and daily cares including body position and hygiene care (NYSCEF Doc. Nos. 48-63; NYSCEF Doc. No. 26 and NYSCEF Doc. No. 27).
However, during the course of the admission, the decedent developed several pressure ulcers which required various treatments, including surgical debridements. The plaintiffs claim that the pressure ulcers developed as a result of negligence and departures from the standards of care by hospital health care providers.
Throughout the admission, the decedent continued to be followed by specialists in infectious disease, nephrology, critical care medicine, pulmonary medicine, internal medicine, and she received nutrition and supportive care. Her prognosis continued to be described as guarded and poor. (NYSCEF Doc. Nos. 48-63; NYSCEF Doc. No. 26 and NYSCEF Doc. No. 27). The SIUH chart documents that on February 3, 2021, at 11:06 a.m., the decedent had no spontaneous respiration or pulse, and she was pronounced dead. The cause of death was listed as [*4]cardiopulmonary arrest due to or as a consequence of COVID-19. (See NYSCEF Doc. Nos. 48-63).

DISCUSSION
On March 23, 2020, then-Governor Cuomo issued Executive Order 210.10, which, among other items, granted physicians, licensed nurses and medical facilities immunity from civil liability for any injury or death occurring directly as a result of an action or omission by a medical professional in the course of providing medical services in support of the COVID-19 outbreak, unless said injury or death was caused by gross negligence.
On April 6, 2020, the New York legislature passed the EDTPA (in effect from March 7, 2020 through April 2021) which codified the above provision with the stated purpose of "promot[ing] the public health, safety and welfare of all citizens by broadly protecting the health care facilities and health care professionals in this state from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstance associated with the public health emergency." See Mera v New York City Health & Hosps. Corp., 197 AD3d 668 (2d Dept 2023), quoting PHL former § 3080.
The EDTPA specifically stated that health care providers would be immune from liability if three elements were met: (1) the health care facility or health care professional was providing health care services in accordance with applicable law, or where appropriate pursuant to a COVID-19 emergency rule; (2) the act or omission occurred in the course of providing health care services and the treatment of the individual was impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives; and (3) the health care facility or health care professional was providing health care services in good faith. (Public Health Law §§ 3080-3082, added L.2020, c. 56, pt. GGG, § 1, eff. March 7, 2020. Amended L. 2020, c. 134, § 2, Eff. Aug 3, 2020). The health care services covered by the immunity provision included those related to the diagnosis, or treatment of COVID-19; or the assessment or care of an individual as it relates to COVID-19, when such individual has a confirmed or suspected case of COVID-19 (see id. PHL former § 3081[5]).
A health care facility can meet its burden to establish immunity pursuant to the EDTPA through the affirmation of a nursing director who had personal knowledge of the facility's response to the COVID-19 pandemic and the effects on covered individuals. See Mera; Whitehead v Pine Haven Operating LLC, 201 NYS3d 697 (3d Dept 2023); Barbato v Eger Health Care & Rehabilitation Ctr., 83 Misc 3d 1238(A) (Sup Ct, Richmond County 2024), 2024 NY Slip Op 50882(U).
To meet this burden, SIUH relies on the affirmation of Shari Torres, R.N., D.P.N., the current Senior Director of Critical Care at SIUH who was employed as the Director of Nursing Education and Professional Development at SIUH in 2020 (NYSCEF Doc. No. 44). The statements made in her affirmation are based upon her personal knowledge and the directives/guidelines of governing agencies, including the United States Center for Disease Control and Prevention and the State of New York, in response to the outbreak of COVID-19. They are also based upon her review of decedent Vasiliki Roussis' SIUH medical records.
Regarding the impact the COVID-19 pandemic had on SIUH, Nurse Torres affirms that "[t]he outbreak of the COVID-19 pandemic required SIUH to drastically alter both the operations of the hospital and how care was rendered due to the never-before-seen level of [*5]critically ill patients sick with a brand new and unknown disease. The decedent's admission was during the pandemic's second wave and at the time a new variant was emerging and the hospital continued to undergo changes in response to the pandemic, and its response to this necessarily impacted every aspect of patient care, including that of the plaintiff [sic] herein."
Nurse Torres affirms that "[b]efore the pandemic, there were five ICUs at SIUH, and the nurse-to-patient ratio was either 2:1 or 1:1, depending on the acuity of the patient. Due to an increase in patient volume, and specifically the amount of critically ill and ventilator-dependent patients, two additional units were converted to ICUs. Although SIUH tried to maintain a 2:1 nurse-to-patient ratio, the ratio oftentimes increased to 3:1; every single one of those ICU patients were ventilated. Accordingly, during this time, SIUH did not have a sufficient staff of either ICU trained nurses or respiratory therapists to accommodate all of their respiratory-compromised patients, including the decedent."
She further stated that "[s]ignificantly ill patients require a higher level of care and are much more dependent on staff than their less-sick counterparts. Staff must therefore dedicate a great deal more time to these patients than others. Nurses were responsible for, among other things, chest physical therapy, suctioning, reviewing the tubing to make sure it was not clogged, and providing nebulizer treatments through the ventilators. Furthermore, the increase in ventilator-dependent patients, many of whose machines were set at a higher setting than in non-covid time periods, placed additional stress on staff, as alarms would be triggered due to low oxygen flow, requiring staff to respond and react to keep those patients alive. The sharp increase in the volume of these high need patients during the pandemic necessarily further reduced the time staff had for patient care."
Nurse Torres further affirms that "[t]he second wave of COVID-19 and the emergence of the new strain created additional and further challenges for the hospital. When the pandemic began in March 2020, most hospital patients were being treated for COVID-19 and its related ailments. Non-COVID healthcare was cancelled, postponed or forgone. Elective surgeries were similarly postponed or cancelled altogether. But by December 2020, when the decedent was admitted to the hospital, SIUH had returned to performing all hospital services, including non-COVID care and elective surgeries. This created new issues for the hospital as its staff had to learn to balance the needs of its critical-care COVID-19 patients and keep them separate and apart from its non-COVID patient population so as to not infect them. With respect to the ICU, in particular, additional challenges were created. If, for example, an ICU room had four beds and one was occupied by a COVID-19 patient, the remaining beds could only be filled with COVID-19 patients. Moreover, because the ICUs were segregated, it was difficult to staff the units. Staff who were treating patients with COVID-19 could not be placed in non-COVID units for fear of exposing patients. Even at that point, transmission of the virus was not completely understood, complicating matters further."
Nurse Torres explains that "[b]y December 2020, the hospital was inundated with sick patients. More patients, sicker patients, new units and additional responsibilities resulted in a significantly diminished staff-to-patient ratio, and consequently, less time for each staff member to dedicate to each patient's care. The already thinly spread staff was further depleted when staff members were exposed to COVID-19 or became ill themselves, requiring 10 days of quarantine." In response to CDC-issued infection control guidance, SIUH adopted strict PPE (N95 respirator or face mask, goggles or a disposable face shield, a clean isolation gown, and clean nonsterile gloves) isolation and visitation policies, all of which were in place during [*6]decedent's admission (NYSCEF Doc. No. 44).
Regarding the impact the COVID-19 pandemic had on the decedent's care, Nurse Torres affirms that "[t]he changes implemented by SIUH in response to the pandemic directly affected decedent's care in several distinct ways as did the pandemic itself. The decedent was cared for during the second wave of the pandemic when staff at SIUH was not only dealing with an increasing number of COVID-19 patients but were also treating numerous patients suffering from typical winter respiratory illnesses such as the flu and RSV. Moreover, by this point, SIUH resumed normal hospital operations and was back to treating all patients, including those undergoing elective surgeries, creating additional issues since this required segregating patients and consequently, staff."
Nurse Torres further affirms that "[a]s a result of the increased burden on the nursing staff due to the overwhelming number of admitted patients, some with COVID-19 and others with various and numerous illnesses, new responsibilities implemented during the pandemic that continued through this second wave, impacting every aspect of patient care, including to the decedent. Staff made every effort in the treatment of critically ill COVID-19 patients to prioritize maintaining respiratory support, monitoring ventilator support and status, and providing basic needs while adjusting to the everchanging circumstances of the pandemic."
Nurse Torres states that "[t]he treatment of ventilated patients only became more complex in the context of the COVID-19 pandemic due to the increased burdens on SIUH staff in connection with increased patient load, greater segregation of patients and the various additional responsibilities. Accordingly, these changes all significantly impacted the care rendered to the decedent. The decedent's care, and specifically skin care, while mechanically ventilated, became extremely difficult under the circumstances faced by the COVID-19 pandemic. Skin care of a ventilated patient to prevent skin breakdowns by way of turning and positioning is extremely difficult under normal circumstances due to the potential for hemodynamic instability that can cause respiratory compromise, profound hypoxia, and/or hemodynamic instability leading to brain damage and death. In the face of the COVID-19 pandemic, these difficulties became heightened due to the increased number of ventilated patients and burdensome responsibilities newly thrust on the staff as set forth above. As a result, many ventilated patients were kept in the prone position with position changes limited to offloading and changing the positioning of the head, arms, and upper body. The decedent, however, was unable to be placed in the prone position as she could not be ventilated in that position. Further complicating skin care for COVID-19 patients like the decedent is that COVID-19 was documented to cause microvascular-related skin injuries."
In a motion for summary judgment based on the EDTPA, it is the defendant's burden to establish prima facie that it was a health care facility providing services in good faith and in accordance with applicable law, or where appropriate pursuant to a COVID-19 emergency rule; that the alleged acts or omissions occurred in the course of providing health care services and that the treatment of the individual is impacted by the health care facility's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives. See Highsmith v Woodhull Medical Center, 83 Misc 3d 1203(A) (Sup Ct, Kings County 2024) 2024 NY Slip Op 50646(U); PHL former §§ 3081; 3082. The statute does not qualify whether the effect is positive, negative, or neutral — "it merely requires that treatment be 'impacted' " (see Alexander v Grand South Point, LLC, 82 Misc 3d 1203[A] [Sup Ct, Nassau County 2024]; Crampton v Garnet Health, 73 Misc 3d 543 [Sup Ct, Orange County 2021]).
Based on Defendants' submissions, all prongs of the EDTPA apply to the case herein. First, it is undisputed that SIUH, as a hospital, is a health care facility that was authorized to provide health care services pursuant to the Public Health Law.
Second, the alleged acts and omissions, stemming from pressure ulcer prevention and treatment during the decedent's hospitalization from December 2020 through February 2021, occurred in the course of providing health care services related to COVID-19 (ventilator support among others) in an individual with a confirmed case of COVID-19, and the treatment of the decedent was impacted by the hospital's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directive. Third, the hospital staff provided health care services in good faith.
It was COVID-19 that brought the decedent to SIUH and during the admission she was evaluated, diagnosed, treated, assessed and given medical care related to COVID-19. It was during the course of, and within the context of, providing health care services related to COVID-19 that the plaintiffs allege, in addition to claims related to the development of pressure ulcers, that the staff at SIUH negligently and carelessly failed to treat and care for the decedent in accordance with the standards of care and treatment generally accepted in the community, failed to institute and adhere to an effective care plan for the decedent; failed to modify the care plan as the decedent's medical condition changed; and failed to adequately and properly examine her causing, inter alia, sepsis, dehydration, malnutrition, emotional trauma, pain and suffering and death (See bills of particulars, NYSCEF Doc. Nos. 30-31).
Good faith is a broad term used to express honest dealings and encompasses a wide variety of dealings. At its core it requires a sincere belief or motive without any malice or the desire to harm others. Depending on the exact setting, good faith may require an honest belief or purpose, faithful performance of duties, observance of fair dealing standards, or an absence of fraudulent intent.
Even when affording the plaintiffs every favorable inference as to their claims, allegations and submitted opposition, there is nothing to suggest that the health care services were not provided to the decedent in good faith. SIUH, like many other local, national and global hospitals, was addressing an unprecedented global pandemic and health care services were provided to the decedent within the context of a global health crisis. Throughout the admission, the decedent was provided multi-disciplinary care and treatment related to the diagnosis and treatment of COVID-19 and developed a breakdown of her skin integrity, resulting in the development of pressure ulcers and death due to the virus (NYSCEF Doc. Nos. 26, 27, 44 and 48-63). The totality of the statements made by the defendant's experts and those of Nurse Torres (NYSCEF Doc. Nos. 26, 27 and 44), together with a review of the extensive medical records submitted in support of the motion (NYSCEF Doc. Nos 48-63), establish that the treatment was provided in good faith. See Barbato v Eger Health Care & Rehabilitation Ctr., 83 Misc 3d 1238(A) (Sup Ct, Richmond County 2024), 2024 NY Slip Op 50882(U); Gillis v Carmel Richmond Nursing Home Inc., 83 Misc 3d 1256(A) (Sup Ct, Richmond County 2024), 2024 NY Slip Op 50984(U).
The defendant has submitted competent proof to support its argument that, as an ICU patient with COVID-19, who was being treated for same, and who required extra staff and resources at a time when the hospital was stretched thin, the decedent's care was impacted directly by COVID-19 policies and responses.
To the extent that PHL former § 3082 (2) contains a general exception for gross [*7]negligence, willful or intentional criminal misconduct, reckless misconduct, and intentional infliction of harm, the plaintiffs do not allege the above in their complaint. As such, the subdivision (2) exception does not apply.
SIUH has established prima facie entitlement to summary judgment and dismissal of the plaintiffs' claims against it based on the EDTPA. The plaintiff failed to present sufficient evidence to demonstrate the claims are not a result of, or impacted by the COVID-19 pandemic, or that a valid exception exists to the applicability of EDTPA. In light of this decision, the court need not address the parties' remaining contentions
Accordingly, it is hereby,
ORDERED, that, in accordance with the opinion outlined above, the defendant's motion for dismissal and summary judgment is granted; and it is further,
ORDERED, that the Clerk enter Judgment accordingly.
Dated: May 14, 2025
ENTER
Hon. Charles M. Troia